_____

No. 95-3157
_____

Bobby Davis; Lloyd Marlo Davis,   *
husband of Bobby Davis,            *
                                   *
     Plaintiffs - Appellants,      *
                                   *
     v.                            *
                                   *
Fulton County, Arkansas; Fulton    *
County Arkansas Quorum Court,      *   Appeal from the United States
individually and as members of     *   District Court for the
the Quorum Court; Paul Martin,     *   Eastern District of Arkansas
individually and as Sheriff of     *
Fulton County, Arkansas;           *
                                   *
     Defendants,                   *
                                   *
Charles Bost, individually and     *
as Deputy Sheriff of Fulton        *
County, Arkansas; Joann            *
Cunningham, individually and as    *
Jailer of Fulton County,           *
Arkansas; Janella Cantrell,        *
individually and as Jailer of      *
Fulton County, Arkansas,           *
                                   *
     Defendants - Appellees.       *
                                  _____

          Submitted:   February 12, 1996

          Filed:   July 26, 1996
                                  _____

Before MAGILL, HEANEY, and MURPHY, Circuit Judges.
                                  _____

MURPHY, Circuit Judge.

     Bobby Davis brought this action after she was raped at her place of business by a detainee in the custody of the Fulton County sheriff's department.  She sued the county, the county Quorum

Court, individual members of the court, and employees of the sheriff's department under 29 U.S.C. § 1983 and state tort theories. The district court[1] dismissed, for failure to state a claim, her constitutional claims against several of the defendants, her state tort claims, and a loss of consortium claim by her husband, Lloyd Marlo Davis.[2] It later granted the motion of the other defendants for summary judgment in their favor on her remaining § 1983 claims. Davis now appeals from the judgment entered for defendants.

Davis lives in Salem, Arkansas. She and her husband own and operate a local dairy equipment sales and service store located near the Fulton County Detention Center (FCDC). On May 13, 1992 she was working alone in the store when she was assaulted and raped by Lawrence D. Hull. At that time Hull was a detainee in the custody of the Fulton County Sheriff's Department. He was being held at the FCDC pending disposition of criminal charges of burglary and theft, as well as for a possible violation of probation related to a prior charge.[3]

Hull had been appointed as a trustee by Paul Martin, the Fulton County Sheriff. In this capacity he performed various tasks for the sheriff and jailers. Several of these tasks, such as taking trash to the dumpster or washing cars, involved Hull being outside the rear door of the FCDC. The sheriff's department had not received any complaints about Hull working outside, nor had

---

[1]The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

[2]The denial of the claim for loss of consortium is not challenged on appeal.

[3]In October 1991, Hull pled guilty to aggravated assault and was sentenced to five years probation. In December 1991 a petition for revocation of probation was filed based on the new charges of burglary and theft.

2

Hull caused any problems as a trustee before the attack on Davis.[4]

On the morning of May 13, 1992 Joann Cunningham, who was the duty jailer[5] at the FCDC on that day, asked Deputy Sheriff Charles Bost to release Hull from his cell to help her unload groceries from her car, which was parked directly behind the jail. She asked Bost to open the cell because she was carrying a load of groceries at the time. Bost opened Hull's cell as instructed and then left the FCDC to work at his insurance agency. As duty jailer, Cunningham was responsible for supervising Hull while he was out of the cell.

Cunningham and Hull carried in the groceries together. Afterwards, Hull washed several cars and took out the trash, which involved being outside of the FCDC building. During this time he was not directly supervised, but was monitored by Cunningham, who made routine checks by viewing Hull from second story windows in the facility. After taking out the trash, Hull returned to the FCDC and went upstairs to the office. The Salem Police Chief, Albert Roork, told him to go back downstairs, which is where the cell area is located.[6]

Hull went downstairs, but instead of returning to his cell, he left the jail facility through an open door. Within a matter of minutes he had walked down the alley to the dairy equipment store,

---

[4]The record does not indicate exactly when Hull was appointed as a trustee, but there is evidence that he was not new to the position. He had been detained at the FCDC for nearly five months at the time of the attack.

[5]Cunningham was an employee of the sheriff's department and her duties included acting as jailer and dispatcher. She also cleaned and shopped for supplies.

[6]The record is not entirely clear about Roork's role in the events or whether Roork could be said to have assumed responsibility for supervising Hull when he directed him to go downstairs. He was never a defendant in this action.

assaulted Davis, and returned to the area outside the rear of the jail.

The FCDC is located in a building on the south side of the main square in Salem. Other businesses and houses are nearby. The Davis store is located on the southwest corner of the square and faces the same street as the FCDC, but it is several businesses away. The buildings on that street have rear doors that open into an alley. The FCDC parking lot is also in the alley. The record shows that the Davis store entrance is approximately 150 feet from the rear door of the FCDC, and at least 100 feet away from the outer perimeter of the FCDC parking area.

After the attack Davis went to a nearby barbershop, and the barber called the sheriff's department. Deputy Bost had returned to the FCDC by this time, and he and two other officers went to the barbershop. Davis reported the rape and identified Hull as the rapist. Hull was charged in state court with rape and first degree battery and was convicted of second degree battery.

Davis then brought this civil action for damages under 28 U.S.C. § 1983 and various theories of state tort liability. The original complaint was filed on May 13, 1993 and amended on April 26, 1994. The amended complaint stated § 1983 claims against Fulton County, Arkansas; the Fulton County Quorum Court and the members of it; Paul Martin, individually and as Sheriff of Fulton County; and Charles Bost, individually and as Deputy Sheriff of Fulton County. Davis claimed that the actions of the defendants, including the appointment of trustees in general, the decision to appoint Hull as a trustee, and the practice of allowing Hull to be outside of the jail unsupervised, increased her risk of danger, thus creating an affirmative duty to protect her. She also alleged various state law tort claims, including battery, assault, false imprisonment, and outrage, against each of the defendants.

4

On February 13, 1995, the district court granted in part and denied in part the defendants' Rule 12(b)(6) motion to dismiss the amended complaint.[7] It dismissed for failure to state a claim Davis' causes of action under § 1983 against the county, the Quorum Court, the individual members of the court, Sheriff Martin, in both his official and individual capacities, and Deputy Sheriff Bost, in his official capacity. The district court concluded that the general allegations about a policy or practice relating to trustees at the FCDC did not make out a risk of harm to Davis greater than that faced by members of the general public and was therefore insufficient to state a constitutional claim. It cited Wells v. Walker, 852 F.2d 368 (8th Cir. 1988), cert. denied, 489 U.S. 1012 (1989), and noted that Davis had not alleged that the policy was targeted at her in any way. The § 1983 claims against Bost in his individual capacity survived the motion to dismiss because the complaint alleged a specific act (releasing Hull to unload groceries behind the Davis store) that might have been said to have exposed Davis to a unique threat of harm. The district court also dismissed the state law claims against all of the defendants, holding that they were entitled to tort immunity under state law.

On May 4, 1995, with permission from the court, Davis filed a second amended complaint. In it, she restated her § 1983 claim against Bost and added § 1983 claims against two new defendants: Joann Cunningham, individually and as Jailer of Fulton County, and Janella Cantrell,[8] individually and as Jailer of Fulton County.

_____

[7]The original opinion and order, filed on February 13, 1995, was withdrawn by the court on April 28, 1995, and a substituted opinion was filed nunc pro tunc.

[8]Janella Cantrell is an employee of the sheriff's department and functions as a secretary, dispatcher, jailer, and personnel manager. The record shows that on March 13, 1992, she worked in the front office at the FCDC and had jailer duties that day only if Cunningham was away from the building. Cantrell herself was off duty at the time of the attack on Davis. She had left the building for lunch at noon and returned after Hull had been locked up again.

She alleged that Cunningham had been involved in the decision to release Hull on May 13, 1992, and that Cantrell had acquiesced in the decision. She also asserted state law negligence claims against Bost, Cunningham, and Cantrell, and she and her husband asserted claims for loss of consortium. On June 14, 1995, the district court granted in part and denied in part the defendants' 12(b)(6) motion to dismiss the second amended complaint. It dismissed all of the asserted claims except the causes of action under § 1983 against Bost, Cunningham, and Cantrell in their individual capacities.

The parties had also filed cross motions for summary judgment on the claims in the second amended complaint, and on July 21, 1995 the district court granted summary judgment in favor of Bost, Cunningham, and Cantrell on the remaining § 1983 claims. It held that Davis had not made a sufficient showing to support her claims that the defendants had a duty to protect her in particular from violent acts by Hull. It explained that although these allegations in her complaint had been sufficient to withstand the earlier motion to dismiss, they were not supported by the facts. Judgment was entered the same day.

On appeal Davis argues that the district court erred in entering summary judgment in favor of Bost, Cunningham, and Cantrell in their individual capacities on her claims under § 1983, in dismissing her claims against them for negligence, and in dismissing her § 1983 claims against the other defendants.

There is disagreement about which parties are properly before the court on this appeal. The notice of appeal names only Bost, Cunningham, and Cantrell in the caption, but Davis asserts issues in her briefs that relate to other previously dismissed defendants. We will start with the issues that all agree are before the court.

Davis argues that the undisputed facts in the record establish

6

that the actions of Bost, Cunningham, and Cantrell on May 13 gave rise to a duty to protect her because they placed her in a position of danger that she would not otherwise have been in that was unique from the danger posed to the general public. She asserts that their actions were reckless and a direct cause of Hull's assault. Davis does not claim that there are disputed material facts to be decided by a fact finder on the issues of liability. She claims that she is entitled to summary judgment on liability and remand for a trial on damages.

Bost, Cunningham, and Cantrell respond that summary judgment was properly entered in their favor. They argue that they had no special constitutional duty to protect her, and that even if such a duty existed, the undisputed facts show that their actions were merely negligent and not a basis for constitutional tort liability under § 1983.

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). All evidence and inferences must be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The non-moving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). We review a grant of summary judgment de novo. Crawford v. Runyon, 37 F.3d 1338, 1340 (8th Cir. 1994).

Davis's constitutional tort claims are premised on an alleged violation of her Fourteenth Amendment rights. She argues that Bost, Cunningham, and Cantrell deprived her of her general liberty interest to be free from unjustified physical assaults on her person when they failed to protect her from Hull's violent actions.

7

As a general rule, the Fourteenth Amendment does not impose any duty on states to protect its citizens against violence inflicted by private actors. DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 195-96 (1989). DeShaney recognized an exception to this rule, however. A duty to protect an individual exists where she is in a special custodial or other setting in which the state has limited her ability to care for herself. Id. at 198. In these circumstances an affirmative duty to protect arises "not from the State's knowledge of the individual's predicament . . . but from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 200. Davis does not claim that she was in any sort of relationship with the defendants, however, nor does she claim that they limited her ability to care for herself.

A duty to protect has also been recognized in the circuit courts when the state affirmatively places a particular individual in a position of danger that she would not otherwise have faced. Dorothy J. v. Little Rock School Dist., 7 F.3d 729, 733 (8th Cir. 1993); Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc), cert. denied, 507 U.S. 913 (1993); Wells v. Walker, 852 F.2d 368 (8th Cir. 1988), cert. denied, 489 U.S. 1012 (1989); Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir. 1990). For such a duty to arise, the actions of the state must create a unique risk of harm to the plaintiff that is greater than the risk faced by the general public. See Wells, 852 F.2d at 371.

Davis argues that Bost, Cunningham, and Cantrell had a constitutional duty to protect her because they released Hull from his cell, instructed him to perform chores outside, and allowed him to leave the premises of the FCDC. She claims that the risk to her was unique because of the proximity of her store to the FCDC and her status as an elderly woman.

It is not disputed that the three defendants named in the

8

notice of appeal played differing roles in respect to the events leading to the rape. The actions allegedly giving rise to the duty to protect Davis were taken primarily by Cunningham. Although the record shows that Bost originally unlocked Hull's cell so he might assist in bringing in the groceries, he did so at Cunningham's direction, and as duty jailer she was solely responsible for monitoring Hull while he performed his tasks. Bost was not at the FCDC at the time the rape occurred and had no obligation to be there. Cantrell was not involved at all with Hull's release or supervision. She only had jailer duties on May 13, 1992 if Cunningham were absent, and there is no allegation that Cunningham left the building that day. Cantrell worked in the front office during the morning and was away at lunch during the time of the rape. The undisputed facts in the record do not suggest that Bost or Cantrell could be held liable for violation of any a constitutional duty to protect. Summary judgment was properly entered in their favor.

Whether Cunningham could be held liable for her conduct requires additional analysis. There is no bright line test for when state action can give rise to a particular duty to protect,[9] but the type of factual situations which may do so is suggested by Wells and Freeman. In Wells, police officers transported a released violent criminal to a store that also served as a bus station. They dropped him off to wait for a bus, and he murdered the store operator. The plaintiff alleged that the police officers took action to provide transportation for the released inmate, and that that action had the result of "placing [the victim], unlike members of the general public, in a unique, confrontational encounter with a person who allegedly had exhibited violent

_____

[9]The district court used a two step test to analyze whether there was a constitutional duty to protect Davis. It first considered whether the state had taken affirmative acts that increased Davis' risk of harm, and then whether the risk was greater for Davis than for the general public.

propensities." Wells, 852 F.2d at 371. The court held that the plaintiff had adequately alleged a constitutional right of protection, but that the case was properly dismissed because the allegations sounded only in negligence. Id. In Freeman, a woman was killed by her husband after a restraining order had been placed against him. The police chief had allegedly instructed other officers not to enforce the order because of his friendship with the husband. The court stated that such facts could be sufficient to create a constitutional duty to protect and remanded for the filing of an amended complaint. 911 F.2d at 54.

The facts in this case are quite different. Cunningham knew Hull had come in from the parking area and that Roork told him to go downstairs where the cell area was located. She knew Hull was unsupervised and that it would be possible for him to leave the building.[10] Cunningham did not send him outside again, however. It was Hull who decided to leave the building,[11] walk down the alley, enter the store, and assault Davis. Unlike the situation in Wells, Hull was not taken to or left at the store, and in fact, had not been authorized to leave the premises. Cunningham was not aware that Hull had left the FCDC until after the rape was reported. Unlike the allegations in Freeman, there is no allegation here that Cunningham interfered with particular measures designed to protect Davis.

Since the complaint alleged that Hull had been instructed to unload groceries and wash cars directly behind the Davis store and entered her store while so engaged, the district court originally

---

[10]Davis also asserts that allowing Hull to wash cars and take out the trash were actions giving rise to the duty to protect. It is undisputed that Hull completed these tasks without incident and then reported to Cunningham.

[11]Davis points out that Hull was never classified as an escapee, but he returned to the FCDC within minutes of leaving and before he was found to be missing.

10

denied the motion to dismiss.  After the record was developed, the actual sequence of events became clearer.  The evidence showed that the FCDC and the store are on the main square of town surrounded by other businesses and homes, that Hull was instructed to work only in the area directly behind the FCDC building, and that he had been sent back to his cell area after completing that work.  Davis did not show that the danger to her resulting from Hull leaving the FCDC was any greater than that faced by the general public in the area.

Davis claims that her risk of harm was greater than that faced by the general public because she was an elderly woman and Hull allegedly had a history of sexual violence toward elderly women.  Hull's prior criminal record consisted of one assault conviction and charges of theft and burglary.  He had not previously been convicted of a sex crime.  Although there is evidence in a police report that the assault for which Hull was on probation may have involved a threatened rape, there was no evidence that Cunningham or the other defendants knew about this.  FCDC employees were aware that several years prior to the Davis rape he had touched the wives of the sheriff and his deputy on the rear, while shopping at the local grocery store.  This showing was insufficient to establish  a unique risk of harm to Davis or a special duty to protect her.  Davis did not come forward with sufficient evidence to support an inference that Cunningham's actions increased the risk to her beyond that faced by other women, that Cunningham knew that Hull posed a special risk to particular women, or that they were to be found in the vicinity of the jail.

The situation here resembles Martinez v. State of California, 444 U.S. 277, 285 (1980), in that Hull was in "no sense an agent" of defendants while engaged in the attack and the defendants were "not aware that [Davis] as distinguished from the public at large,

11

faced any special danger."[12]  The death caused by Martinez after his parole was "too remote a consequence" of the actions by the authorities, <u>id.</u>, and therefore there was no constitutional claim.[13]

Davis suffered a violent and tragic interference in her life and her person, and the carelessness that played a role in allowing the crime to occur is to be deplored.  The record was insufficient, however, to make out a constitutional duty to protect Davis from Hull's violent acts, and negligence by state actors could not have deprived her of such a constitutional right.  <u>See</u> <u>Wells</u>, 852 F.2d at 371.  Negligent, or even grossly negligent, conduct by government officials cannot be the basis of a constitutional tort claim.  <u>Daniels v. Williams</u>, 474 U.S. 327, 330-31 (1986);  <u>Sellers v. Baer</u>, 28 F.3d 895, 902-03 (1994), <u>cert. denied</u>, 115 S. Ct. 739 (1995);  <u>Myers v. Morris</u>, 810 F.2d 1437, 1468 (8th Cir.), <u>cert. denied</u>, 484 U.S. 828 (1987).  A lack of due care by an official causing unintended injury to life, liberty or property does not implicate the due process clause.  <u>Daniels</u>, 474 U.S. at 330-31.  Davis' claim, that Cunningham unreasonably failed to exercise a duty to supervise Hull to prevent him from leaving the FCDC and

---

[12]In contrast, however, the parole authorities in <u>Martinez</u> were "fully informed" about his history of violent sex crimes and the likelihood he would commit another.  444 U.S. at 279.

[13]The dissent relies on <u>Nishiyama v. Dickson County Tenn.</u>, 814 F.2d 277, 280 (6th Cir. 1987), to suggest that the state's ability to control a trustee can give rise to a constitutional claim.  Prison officials in that case allowed a trustee they knew to be violent to run errands unsupervised in a marked patrol car. They were informed that he was using its flashing lights to stop motorists but did nothing about it, and he ultimately murdered a young woman driver.  The prison officials effectively "cloth[ed] an inmate with the authority of the state," <u>Nobles v. Brown</u>, 985 F.2d 235, 238 n. 1 (6th Cir. 1992), and the holding of the case is limited to such circumstances.  <u>See id.</u> (dismissing § 1983 claim based on rape because prisoner was not acting under color of state law).  In this case Hull was never "cloth[ed] . . . with the authority of the state."

12

harming her, is a claim of negligence.

Davis claims that Cunningham knew Hull had engaged in violent and sexually deviant behavior in the past and that her knowledge raised her actions to the level of recklessness. The record does not support that claim, however. Hull had not previously been convicted of any sex crimes. Cunningham stated at her deposition that she knew that Hull had once grabbed a woman's purse and that he had recently been charged with theft, but she did not know whether any of those crimes were sexually oriented. She was aware that several years earlier Hull had inappropriately touched two women while they were grocery shopping. This falls short of a showing that she knew Hull was dangerous for elderly women in particular, and there was no evidence that she even knew of Davis or her presence in the dairy equipment store. Davis did not make a showing of recklessness or of deliberate intent.

To avoid summary judgment Davis was required to come forward with evidence supporting her allegations that the individual defendants should be liable for depriving her of a constitutional right. The record that was developed did not satisfy that burden, and the district court did not err in granting summary judgment in favor of the individual defendants.

Davis also argues that the district court erred in ruling that Arkansas law provides Bost, Cunningham and Cantrell with statutory immunity from tort liability for claims of negligence brought against them in their individual capacity. The district court dismissed Davis's negligence claims on the basis that § 21-9-301 of the Arkansas code affords them immunity for suits based on the negligent performance of official duties, whether the suits are brought against them in their official or individual capacity.

Arkansas law supports the district court's ruling. Ark. Code. Ann. § 21-9-301; Cousins v. Dennis, 767 S.W.2d 296 (Ark. 1989);

13

<u>Hardin v. City of Devalls Bluff</u>, 508 S.W.2d 559 (Ark. 1974). Although there are exceptions to the statutory grant of official immunity, they do not apply in this case. A public official is subject to suit for the commission of an intentional tort, <u>see Battle v. Harris</u>, 766 S.W.2d 431 (Ark. 1989), or for actions taken when the official is not performing a county function. <u>Cousins v. Dennis</u>, 767 S.W.2d 296 (Ark. 1989); <u>Matthews v. Martin</u>, 658 S.W.2d 374, 375 (Ark. 1983). Davis does not claim that Bost, Cunningham and Cantrell acted intentionally, and she does not dispute that they were performing official county functions when they took the actions alleged tortious in this case.

Davis also argues that the district court erred in dismissing her § 1983 claims against the county, the quorum court, and Sheriff Martin, and that this court should reach these issues even though her notice of appeal identified only Bost, Cunningham, and Cantrell as appellees. The appellees suggest that they were prejudiced by the insufficiency of the notice of appeal and argue that we should thus consider only the issues related to the individual defendants.[14]

Although Rule 3(c) of the Federal Rules of Appellate Procedure requires that the notice of appeal identify each appellant, and that requirement is jurisdictional, <u>Torres v. Oakland Scavenger Co.</u>, 487 U.S. 312, 317-18 (1988), the rule does not require that the notice of appeal specifically name each appellee. <u>Thomas v. Gunter</u>, 32 F.3d 1258, 1262 (8th Cir. 1994). Intended appellees must be provided with notice that the appeal is being taken, however, <u>see</u> <u>id.</u>, and the failure to list all in the notice of

_____

[14]The appellees suggest in the alternative that this court lacks jurisdiction over the entire appeal because of the insufficient notice, but they provide no legal basis for this theory nor do they explain how the individual defendants were prejudiced in any way.

appeal could suggest abandonment of the claims against them.[15]

Her notice of appeal did state that the appeal is from the final judgment, and such an appeal permits review of previously entered non-final orders that shaped the scope of the judgment. <u>Berdella v. Delo</u>, 972 F.2d 204, 208 n. 6 (8th Cir. 1992); <u>see</u> 15 A. Wright, Miller & Cooper, Federal Practice & Procedure § 3905.1 (2d ed. 1992). Thus, if the dismissed defendants had proper notice of the appeal, there would be jurisdiction to review the order dismissing the claims against them.

Davis was on notice that the unnamed parties were not considered to be appellees since she used the caption created by the clerk's office on her briefs. That caption names only Bost, Cunningham, and Cantrell as appellees. She did not attempt to contact the clerk to correct the caption, nor did she attempt to amend the notice of appeal or to contact opposing counsel to clarify the identity of the appellees.[16] Instead, she attempted to clarify the identity of the parties with a footnote in her brief suggesting that all of the previous defendants are appellees. Consideration of issues related to defendants not named as appellees could in effect bypass the thirty day time limit for the filing of a notice. Fed. R. App. P. 4(a). In this case, of course, the defendants were all represented by the same counsel who

_____

[15]This is not a case in which <u>et al.</u> was used in the caption to refer to unnamed defendants. <u>See</u> <u>Thomas</u>, 32 F.3d at 1262 (use of <u>et al.</u> in caption sufficient to include all defendants as appellees). The notice of appeal includes the names Bost, Cunningham, and Cantrell, and does not indicate in any way that claims against additional defendants would be raised.

[16]The omission of appellees from the notice may be corrected by amendment or by letter to opposing counsel. <u>See</u> <u>Chathas v. Smith</u>, 848 F.2d 93 (7th Cir. 1988) (failure to name appellee in notice of appeal was harmless error that could be corrected by letter to omitted appellee's counsel).

15

would have been aware of the arguments in her brief.[17]

We need not decide whether these aspects of her appeal should be foreclosed, however, because we have considered them and find them to be without merit.  These claims alleged that the general policy of using trustees and the practice of allowing them to perform chores outside of the jail gave rise to a constitutional duty to protect Davis from harm.[18]  They were dismissed by the district court because they failed to allege the creation of a particularized risk of harm to Davis that was greater than that faced by the rest of the general public, as required by Wells.  On appeal Davis essentially reasserts her allegations that the policy and practice of having trustees gave her a constitutional right to be protected from them and asks for judgment in her favor.

Her complaint suggests that the actions of the county and the earlier dismissed defendants were ill-advised, but it does not allege that these acts or policies or practices affected her in a manner different from the general public, other than that she was the one attacked.  Nor does it allege that any of these defendants should have known that the policy or practice put her in any special danger.  The district court did not err in dismissing the claims.

---

[17]The file indicates that the appellees' attorney attempted to file a notice of appearance on behalf of all the defendants, including the county, the court and the sheriff.  The clerk's office notified him that the appearance would be entered only as to Bost, Cunningham and Cantrell because they were the only appellees listed on the notice of appeal.

[18]The complaint alleged that the policies and procedures relating to the supervision of prisoners were defective, that county authorities had failed properly to evaluate those policies and procedures, and that the Sheriff had abused his position by establishing and using them. She also alleged that the county, the court and the sheriff had failed to establish appropriate and reasonable standards and criteria for the determination and designation of trustees and that they wrongfully allowed Hull to be a trustee.

16

For the stated reasons, the judgment is affirmed.

HEANEY, Circuit Judge, dissenting.

Lawrence Hull has an extensive history of sexually abusive behavior toward older women. As a trusty at the FCDC, Hull was frequently permitted to leave the jail unsupervised to perform various tasks for jail personnel. Bobby Davis co-owns and works in a dairy equipment and sales service store located within 100 feet of the perimeter of the parking lot of the jail. Defendants Charles Bost, Joann Cunningham, and Janella Cantrell knew of Hull's violent and sexually abusive history. Defendants also knew of the location of Davis' store. The store had been at the same location since 1978, and Hull himself had been in Davis' store and spoken to Davis on two previous occasions. Despite the defendants' knowledge of Hull's history and the store's location, they released Hull to work unsupervised in the jail parking lot. Their actions gave Hull the opportunity to sexually assault Davis, who, as an elderly woman working close to the jail, was subjected to a greater risk of harm than the general public. These facts are sufficient to withstand the defendants' motion for summary judgment. They support a finding that defendants engaged in reckless state action that exposed Davis to a risk of harm greater than that faced by the general public. Thus, I respectfully dissent.

At the time Hull attacked Davis, he was in custody at the FCDC. During Hull's detainment, the FCDC gave him trusty status. As a trusty, Hull spent three or four hours outside of his cell each day--often outside the jail--performing various tasks for Fulton County law enforcement personnel. Immediately prior to Hull's attack on Davis, FCDC personnel released Hull to unload groceries, wash cars, and take out the trash in the area behind the FCDC and Davis' store. Hull performed these duties unsupervised. Defendants' understanding was that Hull would "do his jobs and then check back" with them. (Appellant's App. at 343 (Dep. of

17

Cunningham at 7).)  Because Hull raped Davis while in the custody of the FCDC and while performing his duties as a trusty, Davis has presented sufficient facts to support a finding of state action on the part of the defendants.  As the Sixth Circuit has explicitly recognized, jail officials have a custodial relationship with a trusty, in contrast to released parolees or escapees, that provides the officials with the power and authority to direct and control the trusty's actions.  Nishiyama v. Dickson County Tenn., 814 F.2d 277, 280 (6th Cir. 1987) (en banc).[1]

The majority reasons that the defendants took no affirmative state action as required for a due process claim because they did not send Hull back outside after he had completed his duties, but rather Hull chose to leave the facility himself.  The majority employs an artificially narrow understanding of an affirmative course of action by concluding that the defendants were relieved from responsibility when Hull completed his assigned tasks and returned to the FCDC.  The fact that Hull exceeded the limits of the duties for which he was released does not preclude a finding of state action.  Rather, the defendants' failure to supervise Hull

---

[1] The majority relies of Nobles v. Brown, 985 F.2d 235, 238 n. 1 (6th Cir. 1992) to suggest that a prisoner must be "cloth[ed] with the authority of the state" in order for her actions to give rise to a constitutional claim.  In Nobles, a prison guard was taken hostage and raped by a prisoner.  The prison officials allegedly left the prisoner's cell unlocked at a time when it was supposed to be double-locked and failed in their efforts at hostage negotiations.  These facts, at most, demonstrated negligence on the part of the officials.  In contrast, Hull was deliberately released as a trusty.  Under the Regulations of Fulton County Jail a trusty "work[s] for and [is] responsible to the personnel of th[e] facility."  (App. at 341).  As a trusty working for and reporting to the state, Hull was effectively clothed with the authority of the state in contrast to the prisoner in Nobles, "who had no official authority of any kind."  Id. at 238 n. 1.  Moreover, it is important to note, Nobles does not establish the "clothed with the authority of the state" test as a required test.  Rather, it alternatively concludes that the plaintiff did not demonstrate reckless indifference to a known risk that made it highly probable that harm would follow.  Id.

during his entire release facilitated Hull's commission of the crime and constituted state action that continued until the defendants ensured that Hull returned to his cell. See Nishiyama 814 F.2d at 281 (finding state action where officers "by their acts facilitate the crime by providing the criminal with the specific opportunity to commit the crime . . . ."). The defendants' failure to appropriately restrict Hull's freedom afforded Hull the opportunity to attack Davis.

Davis also has presented facts sufficient to survive summary judgment that defendants' conduct posed a greater danger to Davis than to the general public. Defendants' own depositions support a finding that Hull has a significant history of sexually assaulting older women. The defendants admitted in their depositions that they knew Hull had sexually assaulted both Sheriff Martin's wife and Bost's wife prior to his detention at the FCDC. These assaults alone show a pattern of sexually violent behavior toward older women. The depositions also reveal that each defendant was aware of Hull's conviction for assaulting an elderly woman. Although the defendants may not have been aware that the aggravated assault was in fact an attempted rape,[2] (App. at 387-8 (Aff. for Warrant of Arrest), their knowledge of the assault demonstrates their awareness of Hull's violent propensities against older women. All of the defendants were also aware that Hull had burglary charges pending against him. During one of the burglaries, Hull allegedly broke into an elderly woman's home, stole her undergarments, and made numerous calls to sexually explicit 900-numbers. Deputy Sheriff Bost was aware of the sexual aspect of this burglary and theft because the victim was one of Bost's high school friends who

---

[2]I cannot believe that supervisory personnel of the Fulton County Jail were not aware of the facts underlying the aggravated assault. Under the Fulton County Jail Regulations, when an inmate is brought into the jail, the jail personnel must ensure that he is accompanied by the proper legal documents, including the warrant for his arrest, and check the documents for completeness down to the detail of signatures. (App. at 313).

19

lived in the house directly behind him. Bost had visited his friend regarding the burglary and he had talked to "the city officers and the deputies and the other people in the sheriff's office about Lawrence and about his situation" following the burglary. (App. at 373-4 (Dep. of Bost at 33, 35).) Bost also specifically admitted that, even before Hull had committed any of the crimes for which he was eventually incarcerated and before Hull violated his parole, he had been afraid another sexual assault might occur if Hull was not properly supervised. (Appellant's App. at 371-2 (Dep. of Bost at 31-2).) Additionally, Bost stated that Hull had a "propensity . . . to attack a weaker person, anyone who could not offer any resistance or pose any kind of threat to him . . . ." (Appellant's App. at 380 (Dep. of Bost at 53).)

Davis has strongly documented Hull's dangerous propensities, which posed a threat to a clearly-defined group to which Davis belonged. This sort of specific threat is sufficient to support her section 1983 claim. Cases in which no special danger has been found generally involve a much broader risk than that present in the instant case. Fox v. Custis, 712 F.2d 84, 88 (4th Cir. 1983) (parolee involved in one incident of fraud and suspected of one incident of arson did not have history that posed known risk to murder victims); Janan v. Trammell, 785 F.2d 557, 560 (6th Cir. 1986) (targeted threat against one person did not create a special relationship with a member of the general public); Jones v. Phyfer, 761 F.2d 642, 645-46 (11th Cir. 1985) (no special relationship between state and rape victim as to inmate who had previously robbed victim's home, but had posed no harm to her person and had no history of sexual assault). The majority fails to directly address the specific focus of the danger that Hull posed to Davis given his propensity and her proximity. Rather, it simply minimized Hull's history of violent and sexually assaultive behavior toward older women.

In addition to Hull's propensity for sexual violence, Davis'

evidence of proximity to the area where Hull was routinely released without supervision is sufficient to support her 1983 claim. Davis and her husband lived in Salem, Arkansas since 1966, and they owned their store since 1978. The store is located directly behind the jail. On a daily basis, Davis tended to her business approximately 100 feet from where Hull often worked. The defendants knew that the store was close to the parking lot and that the store had an accessible back entrance. Cunningham estimated that it would take only two minutes to walk the distance between the parking lot and the store.

Davis' demonstrated proximity supports her contention that defendants' actions placed her at a greater risk of danger than that of the general public. Contrary to the district court's characterization, our court in Wells v. Walker, 852 F.2d 368 (8th Cir. 1988), cert. denied, 489 U.S. 1012 (1989), did not limit the existence of a specific danger to a strict range of distance; rather, in Wells we held that state action creates a specific harm if it "plac[es] [the plaintiff], unlike members of the general public, in a unique, confrontational encounter with a person whom plaintiffs allege had exhibited violent propensities." Id. at 371. The limitation on Hull's activities as a trusty necessarily restricts the group of people at risk such that they are always distinct from the general public. Compare Nishiyama, 814 F.2d at 280 (distinguishing the more limited risk created by a trustee as opposed to a parolee, in which "the identity of potential victims was difficult to define.") with Fox, 712 F.2d at 88 (finding no specific danger where state agent exposed to a virtually unlimited set of people); Janan, 785 F.2d at 560 (same); Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982) (same).

Finally, Davis' evidence of defendants' admitted knowledge of both Hull's record and the proximity of Davis' store, supports a finding that defendants' actions were, at a minimum, reckless. Daniels v. Williams, 474 U.S. 327, 334 n.3 (1986) (due process

21

violation requires showing of state actors' intentional or reckless conduct). Despite their awareness of the specific danger Hull posed to nearby citizens, particularly elderly women, the defendants released him from his cell, permitted him to work outside the facility unattended, and did not ensure that he promptly returned to his cell when his prison duties were completed. The defendants' deliberate actions are clearly distinguishable from the claims we rejected in <u>Wells</u>, 852 F.2d at 372. Davis does not claim that defendants <u>should have known</u> Hull was dangerous or <u>should have known</u> of her proximity. Rather Davis has demonstrated that defendants <u>did know</u> of her proximity and the danger that Hull posed to women of her age and nevertheless released him. Obviously, closer supervision would have imposed some additional administrative burdens on prison officials, but this is the price an institution must pay if it names a sexually abusive person as a trusty.

The record in this case provides a sufficient factual basis to support a section 1983 violation. The custodial relationship between the defendants and Hull, as a trusty, supports a determination that defendants undertook an affirmative state action that increased Davis' risk of harm. Davis' proximity to the area in which Hull worked and Hull's sexually assaultive propensities support a finding that the state's actions exposed her to a greater risk of harm than that faced by the general public. Davis has also presented evidence that the defendants' conduct was deliberate and intentional, the requisite mental state for a violation of substantive due process. For the above reasons, I dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

22